**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M3 INNOVATION, LLC, | |
| *Plaintiff*, | Case No. __5:23-CV-0063 (MAD/ML)__ |
| v. | |
| REFINED DESIGN AND INSTALLATIONS LLC; NIKAO GROUP, LLC; NIKAO COMPANIES, LLC; GC ELECTRIC & MAINTENANCE, LLC; and MAKO SPORTS LIGHTING, LLC | |
| *Defendants*. | |

## COMPLAINT

M3 Innovation, LLC ("M3"), through counsel, files its Complaint against Defendants Refined Design and Installations LLC ("RDI"), Nikao Group, LLC ("Nikao Group"), Nikao Companies, LLC ("Nikao Co.," with Nikao Group, "Nikao"), GC Electric & Maintenance, LLC ("GC"), and Mako Sports Lighting, LLC ("MSL") (collectively, "Defendants").   In support thereof, M3 alleges as follows:

### PARTIES

1.      M3 is a limited liability company organized under the laws of New York, and its principal place of business is located at 727 E. Washington Street in the Syracuse Center of Excellence in Environmental and Energy Systems in Syracuse, Onondaga County, New York 13244.  M3 is a citizen of the State of New York.

2.      M3 has two members, Joseph Casper and Amy Casper.  Mr. and Mrs. Casper are citizens of New York and maintain their principal residence at 3168 Alex Lane, Baldwinsville, New York 13027.  M3 has no other members.

3.      RDI is a limited liability company organized under the laws of Texas, and its principal place of business is located at 3610-2 N Josey Lane, Suite 223, Carrollton, Texas 75007.  RDI may be served with process through its registered agent, Paracorp Incorporated, at 901 S. Whitney Way, Madison, WI 53711.  RDI is a citizen of Texas.

4.      On information and belief, RDI has one member, Charles Manusos.  Mr. Manusos is a citizen of the State of Wisconsin and maintains his principal residence at 2900 Bridle Court, Lake Geneva, WI 53147.

5.      Nikao Group is a limited liability company organized under the laws of Illinois, and its principal place of business is located at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  Nikao Group may be served with process through its registered agent, Jessica M. W. Heston, at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  Nikao Group is a citizen of Illinois.

6.      On information and belief, Nikao Group has two members, Charles Manusos and Colton Quinn.  Mr. Manusos is a citizen of the State of Wisconsin and maintains his principal residence at 2900 Bridle Court, Lake Geneva, WI 53147. Mr. Quinn is a citizen of the State of Kentucky and maintains his principal residence at 20414 State Route 3, Rush, KY 41168.

7.      Nikao Co. is a limited liability company organized under the laws of Illinois, and its principal place of business is located at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  Nikao Co. may be served with process through its registered agent, Jessica M. W. Heston, at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  Nikao Co. is a citizen of Illinois.

8.      On information and belief, Nikao Co. has two members, Charles Manusos and Colton Quinn.  Mr. Manusos is a citizen of the State of Wisconsin and maintains his principal

residence at 2900 Bridle Court, Lake Geneva, WI 53147. Mr. Quinn is a citizen of the State of Kentucky and maintains his principal residence at 20414 State Route 3, Rush, KY 41168.

9.      GC is a limited liability company organized under the laws of Illinois, and its principal place of business is located at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  GC may be served with process through its registered agent, Jessica M. W. Heston, at 1580 N Northwest Highway, Suite 120, Park Ridge, IL 60068.  Nikao Co. is a citizen of Illinois GC is a citizen of Illinois.

10.     On information and belief, GC has one member, Charles Manusos.  Mr. Manusos is a citizen of the State of Wisconsin and maintains his principal residence at 2900 Bridle Court, Lake Geneva, WI 53147.

11.     MSL is a limited liability company organized under the laws of Wisconsin, and its principal place of business is located there.  MSL may be served with process through its registered agent, Paracorp Incorporated, at 901 S. Whitney Way, Madison, WI 53711.  MSL is a citizen of Wisconsin.

12.     On information and belief, MSL has two members, Charles Manusos and Colton Quinn.  Mr. Manusos is a citizen of the State of Wisconsin and maintains his principal residence at 2900 Bridle Court, Lake Geneva, WI 53147. Mr. Quinn is a citizen of the State of Kentucky and maintains his principal residence at 20414 State Route 3, Rush, KY 41168.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendants under New York's long-arm statute, N.Y. C.P.L.R. § 302.  RDI negotiated and formed a contract with M3 in New York,

performance of RDI's contract (which included performance by RDI or performance accomplished by or through other Defendants) with M3 occurred in part in New York, and RDI committed at least one wrongful act directed toward New York and causing an injury to M3 in New York. Accordingly, RDI should reasonably expect consequences in New York that arise from or relate to its dealings with M3.

15.     Specifically, in fall 2021, Mr. Manusos and other members or employees of RDI and Nikao visited M3's offices in Syracuse, New York to negotiate the contract between RDI and M3.

16.     Nikao Co., MSL, and GC each committed at least one substantial wrongful act in New York, directed at least one wrongful act toward New York, and/or caused injury in New York.  Therefore, each Defendant should reasonably expect consequences in New York that arise from or relate to their dealings with M3 or their dealings with RDI, pursuant to the agreement between RDI and M3.

17.     M3 specifically alleges that, in fall 2021, an electrical installer from GC visited M3's offices in Syracuse, New York to perform test installations prior to M3 agreeing to the contract with RDI. Likewise, in approximately March 2022, after the Alliance Agreement was signed and after the effective date of the start of RDI's responsibilities, Mr. Quinn visited M3's offices in Syracuse, New York for demonstrations and training on the sales kit provided by M3 pursuant to the contract. Mr. Quinn also loaded his vehicle with M3 equipment, sales material, and other proprietary information to be taken back to Wisconsin for warehousing, use, or install.

18.     Further, as alleged below, Defendants operate as alter egos of Charles Manusos such that wrongful conduct committed in or directed toward New York was orchestrated by Mr. Manusos; therefore, all Defendants are subject to jurisdiction in New York.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because substantial acts giving rise to M3's claims occurred here or their impacts were intended to be felt here, including but not limited to: (i) contract negotiations and ratification in this district; (ii) performance of certain contractual responsibilities; (iii) Defendants improper retention of M3 property; and (iv) Defendants' misappropriation of M3's name, goods, and other proprietary information in communications with customers and third parties.

## GENERAL ALLEGATIONS

**A.    Formation and Initial Performance of the Alliance Agreement**

20.    M3 is an innovative technology company in the sports lighting industry.

21.    In late 2021, M3 and RDI—through its member and manager, Charles Manusos—began negotiations regarding the production, supply, sale, and installation of M3's Mako M3 Sports Lighting Solution.  These negotiations occurred in substantial part at M3's corporate office in Syracuse, New York, with Mr. Manusos, or other representatives of RDI and Nikao, physically in attendance there.

22.    On or about December 28, 2021, M3 and RDI ratified the Alliance Agreement, which RDI—and only RDI—had drafted.

23.    Under the Alliance Agreement, RDI was to, among other things: (i) market, sell, and install the Mako Sports Lighting Solutions to customers beginning on February 1, 2022; and (ii) warehouse M3's product for shipment to and installation at customer sites.

24.    Under the Alliance Agreement, M3 was to, among other things: (i) sell the Mako Sports Lighting Solution to RDI for fulfillment of customer orders; and (ii) provide RDI with product installation instructions and pricing models.

25.     Under this contractual arrangement, M3 was to sell the Mako Sports Lighting Solution to RDI.  RDI, in turn, would apply a mark up to the Mako Sports Lighting Solution and charge the customer for the product and for the installation.

26.     The Alliance Agreement required RDI to pay M3 a 30% deposit at the time of each purchase order, with the balance due when products were delivered to RDI's warehouse.

27.     In order to meet its contractual obligations, RDI or its member/manager, Charles Manusos, formed additional companies, controlled by Mr. Manusos, to perform various portions of RDI's responsibilities. These newly-created entities were MSL and GC. In short, RDI handled the shipping and receiving; MSL handled sales and marketing; and GC handled installation.

28.     On information and belief, each of these companies are part of and controlled by Nikao Co. and/or Nikao Group.

29.     Almost immediately after entering into the contract, however, RDI experienced cash flow problems and could not pay its 30% deposit when purchase orders were submitted. Eventually, it could not pay the balance owed when Mako Sports Lighting Solutions were delivered to a warehouse that, upon information and belief, is owned and/or operated by GC.

30.     To ensure customer orders (which already had been placed with RDI) were fulfilled, however, M3 agreed to accept payment when the customer paid RDI after installation of the Mako Sports Lighting Solution at each designated customer site. RDI's failures to pay the deposit or to pay upon delivery of the products breached their contract with M3.

31.     In addition, and for reasons not apparent to M3, Mr. Manusos began submitting purchase orders to M3 through Nikao.  Mr. Manusos explained Nikao would be engaged in some aspects of RDI's performance of the Alliance Agreement, and he expressly agreed that Nikao's purchase orders would be subject to the terms established in the Alliance Agreement and through

M3's and RDI's course of performance of the Alliance Agreement. In essence, Mr. Manusos treated Nikao and RDI as one and the same.

32.     In total, RDI submitted at least five purchase orders, and Nikao submitted at least 17 purchase orders.

33.     M3 fulfilled all 22 purchase orders by causing Mako Sports Lighting Solutions to be delivered to Defendants' warehouse in Wisconsin so RDI, Nikao, and other Defendants[1] could install the product and fulfill customer orders.

34.     Over the course of 2022, M3 fulfilled its obligations pursuant to Defendants' purchase orders for installation of the Mako Sports Lighting Solutions at nine distinct customer sites: Tipton County, including Covington High School, Munford High School, and Brighton High School; La Grange Country Club; East Meadow Soccer Club; Eupora High School; USA Stadium; New Hope High School; Remington Sportsplex; Langley Air Force Base; and Chamberlain High School.

35.     In 2022, Defendants also reached an agreement and submitted a purchase order for Hartford College; however, installation was not completed on this project.

36.     Later in 2022, M3 learned of another purchase order from a third party, Facilities Solutions Group ("FSG"), submitted on behalf of Boyd County High School. This purchase order and the deposit paid by FSG are discussed in more detail below. In relevant part here, the purchase order was never submitted to M3, was hidden by MSL and RDI, and the 30% deposit required by the contract was never paid to M3.

---

[1] According to Mr. Manusos, he also used GC (like Nikao) to perform some aspects of RDI's obligations under the Alliance Agreement—again, according to him, subject to the terms of the Alliance Agreement and M3's and RDI's course of performance of the Alliance Agreement.

37.     Similarly, FSG routinely attempted to contact MSL looking for installation services to be performed at and materials to be delivered to Hartford College. Because MSL was non-responsive, FSG reached out directly to M3 regarding delivery dates for this project.

38.     With the exception of Hartford College and Boyd County, Defendants installed the Mako Sports Lighting Solution at each of these customer sites and, in each case, the customer paid Defendants for the product and the installation (including for the "marked up" price Defendants charged the customers for the product).

**B.     Defendants Breached the Alliance Agreement**

39.     Despite receiving payment from the foregoing customers, Defendants have refused to pay M3.

40.     In particular, RDI has refused to pay the following invoices for M3's fulfillment of its purchase orders:

    a.   Invoice 1039 (3/28/2022): $156,822

    b.   Invoice 1056 (7/19/2022): $25,887.50

    c.   Invoice 1060 (8/11/2022): $42,125.31

    d.   Invoice 1062 (8/11/2022): $378,053.20

    e.   Invoice 1081 (9/30/2022): $81,415.38

41. Similarly, Nikao has refused to pay the following invoices for M3's fulfillment of its purchase orders:

    a.   Invoice 1049 (6/28/2022): $12,225.68

    b.   Invoice 1050 (6/28/2022): $26,576.55

    c.   Invoice 1052 (7/07/2022): $12,225.68

    d.   Invoice 1053 (7/07/2022): $25,532.17

    e.   Invoice 1054 (7/07/2022): $12,225.68

    f.   Invoice 1055 (7/07/2022): $27,620.95

    g.   Invoice 1061 (8/11/2022): $32,375.28

    h.   Invoice 1064 (8/11/2022): $18,382.03

    i.   Invoice 1065 (8/11/2022): $81,220.43

    j.   Invoice 1066 (9/15/2022): $15,785.64

    k.   Invoice 1067 (9/15/2022): $54,489.97

    l.   Invoice 1075 (9/30/2022): $64,448.85

    m.  Invoice 1076 (9/30/2022): $28,526.62

    n.   Invoice 1077 (9/30/2022): $59,575.03

    o.   Invoice 1078 (9/30/2022): $28,526.62

    p.   Invoice 1079 (9/30/2022): $62,011.95

    q.   Invoice 1080 (9/30/2022): $28,526.62

42. At present, RDI and Nikao (and MSL based on the Mako Move Forward Agreement discussed below) owe M3 the sum total of $1,274,579.14 but have refused, without justification, to pay this amount or any portion of it.

    **C.    Defendants Wrongfully Possess M3's Product and Refuse to Return or Pay for It**

43.    Based on RDI's (and Nikao's) ongoing and repeated breach the Alliance Agreement by refusing to pay M3 for the Mako Sports Lighting Solution and based on RDI's inability to reliably perform their contractual responsibilities, M3 sent notice of termination of the Alliance Agreement, effective December 28, 2022.

44.    The Alliance Agreement provides that, upon termination, RDI will provide a complete list of projects quoted with the Mako Sports Lighting Solution.  RDI has failed to provide that information.

45.    Further, M3 has demanded Defendants return all M3 product, including Mako Sports Lighting Solutions or its component parts, that remains in a warehouse owned and operated by any Defendant, including GC.

46.    The products housed by Defendants include Mako Sports Lighting Solutions ordered by Defendants in connection with purchase orders and completed Mako Sports Lighting Solutions or components parts for those solutions to facilitate faster response times on future purchase orders. M3 delivered these products and component parts, and Defendants have not paid for this product.  The total value of the products held in Defendants' warehouses is at least $500,000.

47.    Defendants have no legal right to retain this product and have provided none. Their wrongful retention of this product constitutes conversion and has unjustly enriched them by the value of the product.

48.    Further, Defendants' wrongful retention of M3's product is causing M3 harm in two ways. First, M3 cannot utilize those products for current jobs, which affects its ability to fulfill contractual obligations to current customers. Second, M3 has been forced to source additional material—at increased cost—from suppliers internationally and at expedited rates to fulfill and/or complete orders.

**D.     Defendants Misappropriated M3's Name to Intercept Payment Owed to M3**

49.    The Alliance Agreement prohibited the use of M3's "trade name, trademarks, or copyrights."

50.    On more than one occasion, Colton Quinn, an employee or representative of Nikao, RDI, and/or MSL (and later a member of some of the entities) falsely represented to a third parties, FSG and another sports lighting equipment company, that MSL and M3 are the same company or that Defendants' employees worked for M3.

10

51.     Specifically, in May 2022, in order to secure purchase of poles necessary for installation of the Make Sports Lighting Solution, Mr. Quinn represented to a third-party sports lighting supplier that he worked for M3. Although M3 had a preferred provider for poles, the purchase of those poles was the responsibility of RDI, pursuant to the Alliance Agreement. M3 and its principles were known to this third-party supplier, and Defendants falsely represented to this supplier that they worked for M3 in order to purchase those poles. M3 received no payment for those poles, did not financially benefit from Defendants' use of its name, and did not authorize Defendants to represent that M3 was backing purchases made by Defendants.

52.     The poles purchased by falsely claiming to work for M3 were used on the USA Stadium job.

53.     In approximately September 2022, a representative of that third-party contacted Mr. Casper to request payment because Defendants had failed to pay for the $250,000 poles when invoiced. Based on Mr. Quinn's representation, that representative wrongfully believed Mr. Quinn worked for M3.

54.     M3 and its principles had a prior and ongoing business relationship with that third-party supplier, and Defendants' misrepresentations have caused reputational harm for M3. That harm has impacted M3's ability to do business with that supplier.

55.     In September 2022, accepted a purchase order on behalf of M3. No employee of RDI or any other Defendant is authorized to accept purchase orders directed to M3.

56.     In sum, RDI provided a proposal for the Mako Sports Lighting Solution to Boyd County High School. FSG, an outside third-party distributor, became involved on behalf of the school district. After negotiations between FSG and RDI/Nikao/MSL, Boyd County issued a purchase order to FSG.

57.     FSG had a history of working directly with M3 and had issued purchase orders directly to M3 on two other occasions. Here, FSG again issued a purchase order directed to M3 but was told by a representative of RDI/MSL that MSL and M3 were the same company. This was an intentionally false statement at the time it was made.

58.     That representative also directed FSG to pay the deposit amount directly to MSL/RDI. Indeed, FSG inquired as to whether it should remit payment to M3 and was told that payment should be made to MSL instead.

59.     After receiving that purchase order, RDI/MSL did not issue a purchase order to M3 or pay the 30% deposit owed to M3, as intended by the Alliance Agreement. Instead, RDI/MSL retained the entire deposit paid by FSG on behalf of Boyd County High School. Moreover, by failing to submit the purchase order, RDI/MSL never took steps to fulfill that customer order.

60.     RDI/MSL received the benefit of the Mako Sports Lighting Solution by retaining the deposit amount of more than $150,000. However, they never ordered the product from M3, which would have prompted them to pay a significant portion of that deposit to M3. RDI/MSL knew M3 was owed for the purchase order but hid that information to retain the benefit improperly.

61.     In January 2023, after receiving no response from MSL on the status of the project months after the deposit was paid, FSG inquired directly to M3 as to the project status. This was the first time M3 learned of the purchase order directed to M3 or the project approved by MSL. This was also the first time that M3 learned that RDI/MSL was offering 25-year warranties that directly contradict the terms of the Alliance Agreement, which notes a 10-year manufacturer warranty.

12

62.     RDI's and MSL's conduct has damaged M3's relationship with FSG, a major customer. Moreover, RDI/MSL's intentional conduct was unfairly used of M3's trade name and sold M3's product by passing it off as RDI/MSL's own. Each entity was unjustly enriched by retaining the deposit without submitting the purchase order or paying the contractually-obligated deposit to M3.

### COUNT ONE

### BREACH OF CONTRACT
### (RDI)

63.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

64.     M3 and RDI entered into the Alliance Agreement on December 29, 2021, with RDI to provide marketing, sales, and installation services beginning on February 1, 2022.

65.     M3 at all times performed its obligations set out in the Alliance Agreement.

66.     M3 sold Mako Sports Lighting Solution to RDI with fixed pricing and a 10-year manufacturer's warranty. M3 provided installation instructions and necessary pricing model. M3 directed product inquiries to RDI and met all other contractual responsibilities.

67.     In return, RDI breached the contract repeatedly by failing to pay the 30% deposit required at the time of purchase. Moreover, RDI failed to pay the balance for jobs at the time of product delivery to RDI's warehousing facility. On information and belief, that warehousing facility was operated by GC.

68.     At present, RDI has at least $1.2 million in outstanding invoices for purchase orders and completed installations. Indeed, RDI has refused to pay M3 despite the fact that it has received final payment from customers.

69.     RDI was made aware of its material breach no later than July 2021 and has failed to remedy its non-payment or to act in good faith toward remedying that breach.

70.     Moreover, following notice of termination, RDI has failed to provide a complete list of all projects quoted for the Mako Sports Lighting Solution.

71.     RDI has also refused to return M3's confidential and proprietary information, including but not limited to products, component parts, sales materials, financial information, installation procedures and instructions, and lighting methods and systems. RDI is also in possession of M3 company roadmaps, project calculators, new product release details, and other intellectual property.

72.     RDI's material breaches have caused M3 actual and consequential damages, including the amounts improperly withheld by RDI. In addition, as acknowledged by Section 13 of the Alliance Agreement, RDI's repeated breaches of the contract are an irreparable injury. As such, M3 requests both money damages for all unpaid amounts and an order enjoining RDI from further violating any other terms and provisions of the Alliance Agreement.

## COUNT TWO

### BREACH OF IMPLIED-IN-FACT AND ORAL CONTRACT
### (Nikao, MSL, and GC)

73.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

74.     As discussed above, Nikao, MSL, and GC were owned and operated by the same individuals. Although not expressly permitted by the Alliance Agreement, MSL and GC accepted purchase orders from customers, and Nikao issued the majority of purchase orders to M3.

14

75.     At various times, Charles Manusos and other representatives of these entities represented to M3 that they were operating as a single entity.

76.     Similarly, Mr. Manusos and other representatives of Defendants have asked M3 and other customers to resubmit invoices to new entities. M3 has recently been contacted by a representative connected to the Tipton County projects who relayed that he was invoiced and reinvoiced under three different companies under Mr. Manusos' control. He further represented that he only proceeded with the project due to M3's involvement.

77.     Upon receiving purchase orders from Nikao or communications from MSL or GC, M3 complied with its contractual obligations by providing products or technical assistance for installation and other post-sale activities.

78.     The parties' conduct indicates their joint intention for Nikao, MSL, and GC to be subject to the same terms as RDI. Indeed, those entities operate as one and the same company.

79.     Accordingly, an implied-in-fact contract existed between M3 and Nikao, MSL, and GC. Based on the actions discussed above, these entities breached that contract with M3 and caused damages in excess of $1.2 million.

80.     In addition, Nikao, MSL, and GC have refused to return M3 products. The Alliance Agreement states that RDI (and thus, Nikao, MSL, and GC) are responsible for warehousing and shipping. Yet, in December 2022, those entities attempted to shift warehousing and shipping costs to M3 through an invoice and a custody release document.

81.     Nikao, MSL, and GC have also refused to return M3's confidential and proprietary information, including but not limited to products, component parts, sales materials, financial information, installation procedures and instructions, and lighting methods and systems. Further, the materials stored in GC's warehouse are immensely valuable to M3 as they are

component parts of the Mako Sports Lighting System that can be imitated, copied, or reproduced. These entities are also in possession of M3 company roadmaps, project calculators, new product release details, and other intellectual property.

## COUNT THREE

## BREACH OF CONTRACT
### (MSL)

70.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

71.     On October 5, 2022, M3 and MSL entered into the Mako Move Forward Agreement, in which MSL acknowledged that M3 was owed over $900,000 in aged receivables. Although the invoices were sent to Nikao and RDI, as was customary practice based on the entity providing the purchase order to M3, that amount was assumed by MSL.

72.     As part of that agreement, M3 agreed to *defer* (but not forego) $300,000 of "receivables MSL owes to M3," from the already-received payment from Tipton County; from MSL's next receivable with amounts due to M3, *i.e.*, the next purchase order from a customer, which would result in a payment to M3 of 30% of the purchase order as a deposit; and from the Chamberlain High School job, provided MSL shared its financial statements (Section 7).

73.     MSL never complied with Section 7 of the Move Forward Agreement.

74.     More importantly, MSL failed to remit payment for the more than $800,000 in aged invoices owed under the Move Forward Agreement.

75.     In exchange for that $300,000 deferment, MSL was required to pay a 5% royalty to M3 on all purchase orders after that date. MSL failed to pay that royalty.

76.     Each of these is a material breach that resulted in actual and consequential damages to M3. In addition, MSL attempted to take advantage of the Move Forward Agreement,

which provided that M3 would pay up to $14,695 in labor costs on prior jobs with additional

hours of labor for removal or replacement of Master Control Cards to be paid at a set hourly rate.

Two months later, purportedly pursuant to this contract, MSL attempted to invoice M3 over

$110,000 in labor costs for "troubleshooting" and "assembly." Once again, this was a material

breach of the Move Forward Agreement.

77.     In January 2023, M3 was informed by FSG, a third-party distributor with

contractual relationships with both MSL and M3 that MSL was not responding to their requests

for material delivery dates. M3 believes these efforts from October to December 2022 were an

effort to squeeze money from M3 before MSL ceased operations.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH CONTRACT
### AND BUSINESS RELATIONS & EXPECTANCIES
### (Defendants)

78.     M3 re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

79.     As discussed above, on at least two occasions, in May 2022 and September 2022,

Colton Quinn, a representative of RDI and MSL, falsely represented to third-party suppliers and

distributors that Defendants and M3 were the same entity. These false representations were made

in order to (1) secure credit to purchase poles for the sole benefit of Defendants in their project

installation at USA Stadium and (2) intercept a purchase order from FSG to M3 related to an

order made by Boyd County High School.

80.     In the first instance, Defendants received poles worth approximately $250,000

based on the false representation that Mr. Quinn worked for M3. That vendor, with whom M3

has a preexisting and ongoing business relationship, reached out directly to M3 for payment and

represented to M3 that credit was provided based on this false representation.

81.     RDI, MSL, and/or Nikao received a deposit of over $150,000 for that purchase order from FSG; however, those entities never submitted a purchase order for that job to M3. M3 believes this was done to avoid paying the money owed to M3 for the purchase order.

82.     Moreover, M3 gained no benefit from Defendants' false representations. M3 did not need the poles for install at USA Stadium. That was the sole responsibility of RDI. Similarly, Defendants never provided the money from FSG to M3. That money was intended for M3 and would have been received by it except for RDI/MSL's false representation to FSG. That diversion was tortious, independent of this claim for tortious interference.

83.     Defendants were and are aware that M3 also has other contracts with the third-party pole supplier and FSG. Each are major vendors and distributors in this market. Subsequently, the third-party supplier has requested payment from M3 for the $250,000 poles. Likewise, FSG submitted the Boyd County purchase order to M3, for the first time, in January 2023. Defendants' actions have damaged M3's relationship with the third-party supplier, FSG, and with Boyd County High School. M3 is attempting to continue business relationships with the supplier and FSG, in particular, but has been hampered by Defendants' tortious conduct.

84.     Moreover, Defendants' tortious actions may result in suit by any of these third parties. In such case, Defendants would owe M3 complete indemnity.

## COUNT FIVE

### UNFAIR COMPETITION – MISAPPROPRIATION AND PALMING OFF
### (Defendants)

85.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     Based on that same conduct, Defendants engaged in unfair competition. Colton Quinn, a representative of RDI and MSL, who is also a Vice President of Nikao, falsely

represented to multiple third parties that Defendants and M3 were, in effect, the same company. He made those representations and used M3's trade name in order to secure credit for the purchase of $250,000 in poles used for the USA Stadium job and in order to divert funds from M3. These acts were misappropriation of M3's identity.

87.     In addition, Defendants falsely sold M3 products without an intent to provide those products. This was, in essence, palming off M3's products.

88.     Defendants acted in bad faith, as further evidenced by the fact that the purchase order from FSG on behalf of Boyd County was never submitted to M3 for fulfillment. Instead, these actions were taken to extract money from M3 customers without providing services.

89.     Defendants' unfair competition has caused both monetary and reputational harm to M3.

## COUNT SIX

### CONVERSION
### (Defendants)

90.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

91.     As discussed above, Defendants have improperly retained M3's products despite M3's requests for the return of the Mako Sports Lighting Solutions and their component parts.

92.     Defendants are aware that M3 has sought return of those products and parts for months, and they are aware that M3 served a notice of termination of the Alliance Agreement, dated December 28, 2022.

93.     Defendants were in possession of those products and parts solely as a responsibility to provide warehousing under the Alliance Agreement, and they have not provided

payment for those products or parts. M3 is the owner of the products are parts; yet, it cannot take possession due to Defendants' actions.

94.     The products and parts wrongfully and intentionally held have a value greater than $500,000.

95.     In December 2022, Defendants sent a custody release, which improperly purported to shift costs and liability to M3 and required M3 to provide information to Defendants regarding the subsequent delivery to customers.

96.     In addition, Defendants are improperly withholding money paid by FSG on behalf of Boyd County. Defendants received over $150,000 by accepting a purchase order made out to M3 and by failing to send a reciprocal purchase order to M3, which would have necessitated payment under the parties' contracts.

## COUNT SEVEN

### UNJUST ENRICHMENT & CONSTRUCTIVE TRUST
### (Defendants)

97.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     Nikao and GC do not have any direct contractual relationship with M3 but have either an implied-in-fact contract or a quasi-contractual relationship based on the parties' course of dealings. These entities have been unjustly enriched by submitting purchase orders to M3 without remitting payment for M3's product. Likewise, they have received payment from customers for installation of M3's products without payment to M3 for those products.

99.     Moreover, RDI and MSL have been unjustly enriched through false representations to third parties and diversion of funds intended for M3, as discussed above.

100. GC and Nikao also continue to benefit unjustly from holding M3's products, parts, and intellectual property.

101. Accordingly, each Defendant has been enriched at M3's expense. They have profited or will continue to derive profits from M3's name, products, and intellectual property. Defendants cannot, in equity and good conscience, be permitted to retain that benefit.

## COUNT EIGHT

### CIVIL CONSPIRACY
### (Defendants)

102. M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

103. Defendants combined to accomplish unlawful purposes by engaging in concerted action to cause RDI to breach the Alliance Agreement and otherwise tortiously interfere with the Alliance Agreement; by retaining M3's product and parts at a warehouse in Wisconsin and refusing to return or pay for it; and by using M3's name to induce FSG, on behalf of Boyd County, to pay a deposit directly to MSL, as opposed to M3, and by failing to provide that purchase order to M3.  The objects of Defendants' conspiracy were to wrongfully profit, and wrongfully deny M3 profit, through:

    a.  interference with the Alliance Agreement;

    b.  inducement to sign the Move Forward Agreement with no intent to comply with MSL's obligations under that agreement;

    c.  wrongful retention of and failure to pay for M3's products in a Wisconsin warehouse owned or operated by Defendants; and

  d. wrongful misappropriation of M3's name in order to mislead FSG and palming off M3's products as its own in order to receive payment without providing products or services.

104. Defendants, either explicitly or implicitly and through their common member, Charles Manusos, formed an agreement to combine to accomplish the foregoing unlawful purposes.

105. Defendants each committed overt acts in furtherance of their conspiracy by causing RDI to breach the Alliance Agreement; wrongfully retaining and failing to pay for M3's products in a Wisconsin warehouse; and by wrongfully using M3's mark to mislead Boyd County to intercept funds owed to M3.

## VEIL PIERCING

106. M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

107. Defendants each have one member and manager: Charles Manusos.

108. Manusos operates each of Defendants in ways that abuse and disregard the corporate form. By way of example, despite M3 having contracted with RDI for the Alliance Agreement, Mr. Manusos caused GC and/or Nikao to perform projects that RDI should have performed, including installation of M3 products for customers.

109. Mr. Manusos also submitted purchase orders from Nikao and entered into a contract on behalf of MSL, which purported to assume Nikao and RDI debts owed to M3.

110. Additionally, Mr. Manusos has caused Defendants to refuse payment to M3 for products M3 delivered, including products Defendants installed and for which they have been paid.

111.     Mr. Manusos has boasted to M3 that he has personal "lines of credit" with at least RDI and Nikao and draws money, in the form of "loans," from them with regularity.

112.     Mr. Manusos has engaged in such conduct to render Defendants illiquid and/or undercapitalized, leaving Defendants without funds to pay money contractually and equitably owed to M3.

## DAMAGES, FEES, AND COSTS

113.     M3 re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

114.     As a direct and proximate result of Defendants' willful acts and omissions, M3 has been damaged and is entitled to relief as follows:

   a.   For Count I: contract damages in the amount of $1,274,57.10 or greater amounts to be proven at trial; and "cover" damages equal to the difference in cost for material M3 has been forced to source from international supplies due to Defendants' wrongful retention of and refusal to return M3's product, which is held in Defendants' warehouse;

   b.   For Count II: contract damages in the amount of $1,274,57.10 or greater amounts to be proven at trial; and "cover" damages equal to the difference in cost for material M3 has been forced to source from international supplies due to Defendants' wrongful retention of and refusal to return M3's product, which is held in Defendants' warehouse;

   c.   For Count III: contract damages in excess of $800,000.00 or greater amounts to be proven at trial; and reputational damages M3 sustained with respect to

customers who ordered (and paid for) installation of M3 product, but which Defendants have failed to install;

d.  For Count IV: damages in excess of $150,000.00 paid by FSG or greater amounts to be proven at trial; and reputational damages M3 sustained with respect to its relationship with FSG and Boyd County High School;

e.  For Count V: damages in excess of $150,000.00 paid by FSG or greater amounts to be proven at trial; and reputational damages M3 sustained with respect to its relationship with FSG and Boyd County High School;

f.  For Count VI: damages in the amount of $650,000 or greater amounts to be proven at trial, for the M3 product wrongfully withheld at Defendants' warehouse and for money withheld after receipt of purchase order from FSG;

g.  For Count VII: damages in excess of $650,000 or greater amounts to be proven at trial, for the M3 product wrongfully withheld at Defendants' warehouse; and the amount of the intercepted payment Defendants' received through the unlawful use of M3's name;

h.  For Count VIII: all damages contemplated in Counts I through V;

i.  Attorneys' fees and case expenses, including costs of filing suit, to the extent permitted by law;

j.  Punitive damages, in amounts to be determined at trial, to the extent permitted by law;

k.  Such further general or specific relief to which M3 is entitled at law or in equity; and

l.   Any additional relief and damages permitted by the law and/or deemed just

and proper by this Court.

## **JURY DEMAND**

115.   M3 demands a jury on all issues so triable.


\*   \*   \*   \*

Dated:  January 17, 2023

Respectfully submitted,

**M3 INNOVATION, LLC**

/s/ *Mitch McGuffey*
C. Mitch McGuffey (NDNY Bar No. 4961736)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Telephone:  (601) 960-8600
Email:  mitch.mcguffey@formanwatkins.com

Nicole J. Diesa (NDNY Bar No. 702716)
FORMAN WATKINS & KRUTZ LLP
328 Newman Springs Road
Red Bank, New Jersey 07701-5685
Telephone:  (732) 852-4400
Email:  nicole.diesa@formanwatkins.com

*Counsel for M3 Innovation, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means on the 17th day of January, 2023.

*/s/ Mitch McGuffey*
C. Mitch McGuffey

26